# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **MICHAEL ANDREW CALL,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17cv00026 |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Michael Andrew Call, ("Call"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

-1-

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Call protectively filed applications for DIB and SSI on April 18, 2012, alleging disability as of December 15, 2011, based on diabetes; depression; anxiety; paranoia; panic attacks; knee problems; numbness and pain in his feet and ankles; and a torn rotator cuff of the right shoulder. (Record, ("R."), at 411-16, 445, 455, 485.) The claims were denied initially and upon reconsideration. (R. at 188-90, 194, 199-201, 203-05.) Call then requested a hearing before an administrative law judge, ("ALJ"). (R. at 207-08.) A hearing was held on September 10, 2014, and a supplemental hearing was held on March 2, 2015, at which Call was represented by counsel. (R. at 60-100.) By decision dated March 9, 2015, the ALJ denied Call's claims. (R. at 168-77.) Call pursued his administrative appeals, (R. at 349), and, on April 28, 2016, the Appeals Council remanded his case for further action. (R. at 185-86.) Upon remand, a third hearing was held on August 25, 2016, at which Call was represented by counsel. (R. at 42-59.)

By decision dated November 23, 2016, the ALJ denied Call's claims. (R. at 10-26.) The ALJ found that Call met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016. (R. at 12.) The ALJ also found that Call had not engaged in substantial gainful activity since December 15, 2011, the alleged onset date. (R. at 12.) The ALJ found that the medical evidence established that Call suffered from severe impairments, namely an anxiety disorder with social phobia; obesity; rotator cuff injury; osteoarthritis; and diabetes mellitus, but he found that Call did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12-13.) The ALJ found that Call had the residual functional

capacity to perform sedentary work[1] except that he was only able to occasionally kneel, crouch, stoop, balance, climb ramps and stairs, reach overhead with the right upper extremity and interact with others; he could frequently reach in other directions, handle and finger with the bilateral upper extremities; and he could never crawl or climb ladders, ropes and scaffolds, interact with the public or have direct contact with crowds of unfamiliar people. (R. at 15.) The ALJ found that Call was unable to perform his past relevant work. (R. at 24.) Based on Call's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that jobs existed in significant numbers in the national economy that Call could perform, including jobs as an assembler, a weight tester and an addressing clerk. (R. at 24-25.) Thus, the ALJ found that Call was not under a disability as defined under the Act, and was not eligible for DIB or SSI benefits. (R. at 25-26.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2017).

After the ALJ issued his decision, Call pursued his administrative appeals, (R. at 409), but the Appeals Council denied his request for review. (R. at 1-5.) Call then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2017). The case is before this court on Call's motion for summary judgment filed December 22, 2017, and the Commissioner's motion for summary judgment filed January 26, 2018.

---

[1] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2017).

Call was born in 1972, (R. at 63, 411, 413), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a college degree in machine shop and past relevant work experience as a gluer, a dishwasher and an assistant operator at a stair and handrail parts manufacturer. (R. at 64, 68-69, 81-82, 456.) Call stated that his days consisted of watching television, taking care of his dog and cat, visiting friends and occasionally fishing with friends. (R. at 65.) Call testified that he had trouble using his right hand to pick up small objects and to grip objects. (R. at 51-52.) He stated that he experienced numbness in his feet, which made him "wobbly." (R. at 74-75.) Call stated that he had to prop his feet for 30 minutes to an hour daily due to numbness in his feet. (R. at 75.)

Asheley Wells, a vocational expert, also was present and testified at Call's September 2014 hearing.[2] (R. at 80-87.) Wells was asked to consider a hypothetical individual of Call's age, education and work history, who could occasionally lift and carry items weighing up to 10 pounds with his right arm and up to 20 pounds with his left arm; who could sit for six hours in an eight-hour workday; who could stand and walk four hours in an eight-hour workday; who could only occasionally reach overhead, as well as push and pull; who could frequently reach in all other directions and continuously handle, finger and feel with his right hand; who could frequently reach overhead, as well as push and pull, and continuously reach and/or finger and feel with his left hand and arm; who could occasionally operate equipment, climb stairs and ramps, balance and kneel; who could frequently stoop; and who could never climb ladders, crouch, crawl or work around food or other types of products due to having hepatitis C. (R. at 82-83.) Wells stated that the individual could not perform Call's prior work, but that a

---

[2] A hearing was scheduled for June 30, 2014; however, at the hearing, Call requested that the hearing be postponed to give him the opportunity to obtain an attorney. (R. at 101-04.)

significant number of light[3] jobs existed in the national economy that such an individual could perform, including jobs as an assembler. (R. at 83-85.) She was asked to assume the same individual, but who was limited as indicated in the assessment of Dr. Laurie E. Rennie, M.D., (R. at 681-86), and who could not work around the public and could perform only simple one-to-three step jobs. (R. at 86.) Wells stated that the hypothetical individual could perform light jobs that existed in significant numbers in the national economy, including jobs as an assembler, a packing line worker and a garment folder. (R. at 86.) Wells also stated that there would be no jobs available should the hypothetical individual be limited as indicated by the assessment of licensed clinical social worker, Marcy S. Rosenbaum. (R. at 87, 627-28.)

Mark Hileman, a vocational expert, testified at Call's March 2015 supplemental hearing. (R. at 95-99.) Hileman was asked to consider a hypothetical individual of Call's age, education and work history, who could occasionally lift and carry items weighing up to 20 pounds with his right arm and frequently lift and carry items weighing up to 20 pounds with his left arm; who could sit six hours in an eight-hour workday and stand and walk four hours in an eight-hour workday; who could occasionally reach overhead, push and pull with his right hand and frequently reach in all other directions, handle, finger and feel with his right hand; who could frequently reach overhead, as well as push and pull with his left hand and continuously reach in all directions, handle, finger and feel with his left hand; who could occasionally use his left and right feet for the operation of foot controls; who could never climb ladders or scaffolds, crouch and crawl; who could occasionally climb ramps and stairs, balance and kneel; who could frequently stoop; who could never work around unprotected heights, humidity, wetness and

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2017).

extreme cold; who could occasionally work around extreme heat and vibration; and who could perform simple, routine, unskilled, one-to-three step jobs that did not require interaction with the public. (R. at 96-97.) He stated that there would be a significant number of unskilled, light jobs that existed in the national economy that such an individual could perform, including jobs as a checker, a laundry folder and a bindery-machine offbearer. (R. at 98.)

Wells also testified at Call's August 2016 hearing. (R. at 56-58.) She was asked to consider a hypothetical individual of Call's age, education and work history, who had the residual functional capacity to perform sedentary work; who could occasionally stoop, crouch, kneel, climb stairs, balance, reach overhead with the right dominant upper extremity and interact with co-workers and supervisors; and who could not crawl or climb ladders; who could frequently reach, handle and finger bilaterally; and who could not have public interaction or direct contact with crowds or unfamiliar persons. (R. at 56-57.) Wells stated that such an individual could perform unskilled sedentary jobs that existed in significant numbers in the national economy, including jobs as an assembler, a weight tester and an addressing clerk. (R. at 57.) Wells also testified that the same hypothetical individual, but who was limited to using his right dominant upper extremity to only occasionally reach, handle and finger, could not perform the jobs previously identified. (R. at 57.) Wells further stated that there would be no jobs available should the individual be limited as indicated in the medical source statement completed by Rosenbaum. (R. at 57-58.)

In rendering his decision, the ALJ reviewed medical records from Joseph Leizer, Ph.D., a state agency psychologist; Dr. Robert Keeley, M.D., a state agency physician; David Deaver, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Victoria Grady, M.D.; Marcy S.

Rosenbaum, L.C.S.W.; Dr. Laurie E. Rennie, M.D., a medical expert; Saltville Medical Center; Johnston Memorial Hospital; Abingdon Surgical Associates; Abingdon Family Practice; Dr. Stephanie H. Alford, M.D.; and Christopher M. Carusi, Ph.D., a licensed clinical psychologist.

Call received treatment and counseling at the Saltville Medical Center from December 2010 through July 2016[4] for generalized anxiety disorder; panic disorder without agoraphobia; major depressive disorder; upper respiratory infections; a skin abscess; right shoulder and knee pain; hypertension; diabetes mellitus; hyperlipidemia; cellulitis; low back pain; right elbow joint pain; flank pain; and thrombocytopenia. (R. at 556, 558-59, 562, 565-66, 568, 570, 572, 574, 576, 578, 583, 586, 588, 632-33, 636, 638, 640-42, 646-47, 650-53, 657, 660-63, 675, 698, 705-14, 717-18, 829, 836, 866, 868, 870, 885, 889-92, 896, 898, 900, 904, 913, 917, 929.)

Rosenbaum's examinations throughout 2012 repeatedly showed that Call had fair grooming; appropriate behavior; fair insight; no memory problems; normal thought content; normal speech; coherent thought processes; anxious mood and depressed affect; and a then-current Global Assessment of Functioning, ("GAF"),[5] score of 60.[6] (R. at 554, 556, 558-59, 562, 568, 570, 574, 578, 583, 586, 632, 636, 640, 646, 650, 652, 656-57, 660-62.) The record shows that, on six occasions

---

[4] Call received counseling from Marcy S. Rosenbaum, L.C.S.W., a licensed clinical social worker, from January 2012 through February 2016.

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

between January and March 2012, Call's GAF score was assessed at 50.[7] (R. at 572, 574, 576, 578, 583, 586.) In March 2012, Call reported that he did not get a job for which he had applied. (R. at 568.) In May 2012, Call reported that he had a busy week fixing his automobile. (R. at 558.) In June 2012, Call reported that he was getting out of the house more, fishing and spending time with friends. (R. at 662.) In September 2012, Rosenbaum noted that Call abruptly left her office making negative comments about the medical facility after being told that his treating nurse practitioner could no longer prescribe controlled substances. (R. at 650-51.)

On August 18, 2012, Dr. Victoria Grady, M.D., examined Call at the request of Disability Determination Services. (R. at 620-25.) Call reported that he had suffered from depression and anxiety his entire adult life. (R. at 620.) He reported that, since taking medication, he experienced only two panic attacks a week, as opposed to daily panic attacks. (R. at 620-21.) Call reported that he was paranoid, stating that he had "trouble trusting people." (R. at 621.) He reported a right rotator cuff tear following a motor vehicle accident, which was treated only with physical therapy. (R. at 621.) Call reported that he could not stand for very long because his legs and ankles swell, and he gets tired. (R. at 621.) X-rays of Call's lumbar spine, right shoulder and right knee were normal. (R. at 616-18.) Dr. Grady reported that Call had a normal gait; he was able to balance; he had normal bilateral grip strength; he had normal strength in the upper and lower extremities; he had tenderness and crepitus in his knees; he had limited range of motion in his hips, knees, and cervical and thoracolumbar spines; he had clear, fluent and congruent speech; and appropriate thought processes. (R. at 622-23, 625.) Dr. Grady diagnosed diabetes with neuropathy; depression and anxiety; panic attacks;

---

[7] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

paranoia; right rotator cuff syndrome; and knee pain. (R. at 623.) Dr. Grady opined that Call could stand, walk and/or sit up to six hours in an eight-hour workday; that he would need to change positions as needed due to knee pain; he could occasionally lift and carry items weighing up to 20 pounds; and he could occasionally reach, handle, feel, grasp, finger, bend, stoop, crouch and squat. (R. at 623.)

On September 4, 2012, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Call had no restrictions on his activities of daily living, experienced only mild difficulties in maintaining social functioning, experienced no difficulties maintaining concentration, persistence or pace and had experienced no repeated episodes of extended duration decompensation. (R. at 110-11.)

On September 4, 2012, Dr. Robert Keeley, M.D., a state agency physician, found that Call had the residual functional capacity to perform light work. (R. at 112-15.) He found that Call was limited in his ability to push and/or pull with his right upper extremity. (R. at 113.) Dr. Keeley found that Call could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 113.) He found that Call was limited to frequent overhead reaching with his right upper extremity. (R. at 114.) No visual or communicative limitations were noted. (R. at 114.) Dr. Keeley found that Call must avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 114.)

On October 16, 2012, Rosenbaum completed a mental assessment, indicating that Call had no significant limitations in his ability to carry out very short and simple instructions and to be aware of normal hazards and take appropriate precautions. (R. at 627-28.) She opined that Call was moderately

limited in his ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to ask simple questions or request assistance; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. (R. at 627-28.) Rosenbaum found that Call was markedly limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to travel in unfamiliar places or use public transportation. (R. at 627-28.)

On October 15, 2012, Call saw R. Steven Sadler-Chapman, F.N.P., a family nurse practitioner with the Saltville Medical Center, for complaints of right shoulder and knee pain. (R. at 644.) He was diagnosed with joint pain. (R. at 644.) That same day, Call saw Dr. Jamie C. Goodman, D.O., a physician with the Saltville Medical Center, and reported that he had been out of Valium for a few days and was having feelings of anger. (R. at 642.) Dr. Goodman reported that Call had fair grooming; fair insight; normal speech; appropriate behavior; euthymic mood; coherent thought processes; no memory problems; and normal thought content. (R. at 642.) Dr. Goodman advised Call that he would not prescribe Valium

or any other benzodiazepines. (R. at 642.) Dr. Goodman diagnosed anxiety disorder, not otherwise specified. (R. at 642.) Call reported on numerous occasions throughout 2012 that his medication, breathing techniques and counseling helped his symptoms of depression and panic attacks. (R. at 558, 562, 572, 574, 576, 585, 636, 640, 662.) On October 2, 2012, Call reported to Rosenbaum that he spent time sleeping, playing video games, talking on the telephone and walking. (R. at 646.) He reported that he believed he could wash dishes for a living if he did not have to be around other people. (R. at 640.)

On November 14, 2012, Call was admitted to Johnston Memorial Hospital for an anterior chest wall wound with staph infection. (R. at 787-89.) He underwent debridement and drainage and advancement flap complex closure, and, by April 11, 2013, it was noted that Call was 100 percent healed. (R. at 777-84, 801-06, 842.)

On June 28, 2013, Dr. Simon Pennings, M.D., saw Call for complaints of anxiety. (R. at 688-90.) Call reported that he had good symptom control. (R. at 688.) Dr. Pennings noted that Call's hypertension and diabetes mellitus were stable. (R. at 688.) Dr. Pennings reported that Call had a normal mood, and examination of both feet was normal. (R. at 689.) In December 2013, Call's anxiety was asymptomatic. (R. at 691.) Call saw Dr. Pennings on five occasions from June 2014 through May 2016. (R. at 694-96, 816-18, 849-57.) During this time, his anxiety was asymptomatic; he had good symptom control with medication; his mood was normal; and his hypertension was stable. (R. at 694-95, 816, 818, 849, 851-52, 855, 857.)

On July 23, 2013, David Deaver, Ph.D., a state agency psychologist, completed a PRTF, finding that Call had no restrictions on his activities of daily

living, experienced only mild difficulties in maintaining social functioning, experienced no difficulties maintaining concentration, persistence or pace and had experienced no repeated episodes of extended duration decompensation. (R. at 140-41.)

Also on July 23, 2013, Dr. Robert McGuffin, M.D., a state agency physician, found that Call had the residual functional capacity to perform light work. (R. at 143-45.) He found that Call was limited in his ability to push and/or pull with his right upper extremity. (R. at 143.) Dr. McGuffin found that Call could occasionally climb ladders, ropes and scaffolds, kneel and crawl; frequently climb ramps and stairs, balance, stoop and crouch. (R. at 143-44.) He found that Call was limited to frequent overhead reaching with his right upper extremity. (R. at 144.) No visual or communicative limitations were noted. (R. at 144.) Dr. McGuffin found that Call must avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 144-45.)

Call was next seen by Rosenbaum on October 14, 2013, stating that he was returning due to continued depression and need for support. (R. at 717-18.) He reported that his medication helped with his symptoms. (R. at 717.) Rosenbaum reported that Call had fair grooming; appropriate behavior; fair insight; no memory problems; normal thought content; normal speech; coherent thought processes; melancholy mood and affect; and a then-current GAF score of 60. (R. at 717-18.) On October 21, 2013, Sadler-Chapman reported that Call had good range of motion of the right knee with minimal crepitus and tenderness over the lateral aspect and painful outward rotation in this area. (R. at 714.) On November 11, 2013, Call reported that he had several days of staying in bed depressed, which he attributed to the anniversaries of his brother's and father's deaths. (R. at 712.) He reported that counseling helped him to feel better. (R. at 712.) Rosenbaum assessed

Call's then-current GAF score at 60. (R. at 712.)

On January 28, 2014, Call reported to Rosenbaum that he had only a few panic attacks "now and then." (R. at 710.) Rosenbaum reported that Call had fair grooming; appropriate behavior; fair insight; no memory problems; normal thought content; normal speech; coherent thought processes; anxious mood and affect; and a then-current GAF score of 60. (R. at 710.) On March 11, 2014, Rosenbaum noted that Call had difficulty putting sentences together, slurred some of his words, and his eyes closed frequently. (R. at 708-09.) Call admitted to taking unprescribed suboxone periodically, including taking a "little piece this morning." (R. at 708.) Call also admitted to using Valium and marijuana. (R. at 708.) Rosenbaum reported that Call had fair grooming; slow behavior; fair insight; no memory problems; normal thought content; slurred speech; blocking thought processes; and stupor mood and affect. (R. at 708.) Rosenbaum would not allow Call to drive himself home, and a family member was contacted to pick him up. (R. at 709.) Call refused referral for rehabilitation, despite acknowledging he had an "issue with drugs." (R. at 709.)

On March 17, 2014, Call saw Sadler-Chapman for complaints of lower leg pain following a fall. (R. at 706.) He was diagnosed with lower leg joint pain. (R. at 706.) On March 25, 2014, Call reported that he last smoked marijuana three to four days prior and that he would smoke marijuana every day if he had it. (R. at 704.) Call reported that he became addicted to Lortab following surgery and that he had begun taking Suboxone that was not prescribed for him. (R. at 704.) Rosenbaum diagnosed generalized anxiety disorder; panic disorder without agoraphobia; cannabis abuse; and opioid abuse. (R. at 705.)

On April 9, 2014, Dr. Laurie E. Rennie, M.D., a medical expert, completed

medical interrogatories regarding Call's physical impairments. (R. at 678-80.) Dr. Rennie reported that a review of Call's medical records indicated that he suffered from an abscess with failed skin graft, secondary to Call removing a device;[8] knee swelling with negative x-rays; hepatitis C by history; and diabetes mellitus, poorly controlled. (R. at 678.) She reported that Call's impairments did not meet or equal any impairment described in the Listing of Impairments. (R. at 679.) Dr. Rennie reported that Call could work in a restricted environment without much social interaction. (R. at 679.)

That same day, Dr. Rennie completed a physical assessment, indicating that Call could frequently lift and carry items weighing up to 20 pounds with his left arm and occasionally lift and carry items weighing up to 20 pounds with his right arm. (R. at 681-86.) She opined that Call could sit for up to six hours in an eight-hour workday and without interruption; stand up to four hours in an eight-hour workday and that he could do so for up to two hours without interruption; and walk for up to four hours in an eight-hour workday and that he could do so for up to two hours without interruption. (R. at 682.) Dr. Rennie reported that Call could frequently reach overhead with his left hand; occasionally reach overhead with his right hand; continuously reach in all other directions with his left hand; frequently reach in all other directions with his right hand; continuously handle, finger and feel with both hands; frequently push and pull with his left hand; occasionally push and pull with his right hand; occasionally operate foot controls with both lower extremities; frequently stoop; occasionally climb stairs and ramps, balance and kneel; and never climb ladders or scaffolds, crouch or crawl. (R. at 683-84.) She opined that Call could continuously work around dust, odors, fumes and pulmonary irritants; frequently work around moving mechanical parts and operate a motor vehicle; occasionally work around extreme heat and vibrations; and never

---

[8] The particular device removed by Call was not specified by Dr. Rennie.

work around unprotected heights, humidity and wetness and extreme cold. (R. at 685.)

On May 23, 2014, Sadler-Chapman noted that Call denied anxiety and depression. (R. at 700.) In September 2014, Call reported that he fell the previous week while fishing. (R. at 838.) Sadler-Chapman reported that Call was in "good spirits." (R. at 838.)

On September 26, 2014, Call presented to the emergency room at Johnston Memorial Hospital for cellulitis of the right hand. (R. at 735, 740-53.) Call reported that he fell on his hand and cut it while fishing. (R. at 740, 749.) Call reported a history of IV drug use. (R. at 735.) X-rays of Call's right hand showed soft tissue swelling and small radiolucent foci within the dorsal soft tissues, likely representing subcutaneous gas. (R. at 771.) An MRI of Call's right hand showed soft tissue fluid consistent with infectious tenosynovitis and some artifact consistent with gas. (R. at 772-73.) On September 27, 2014, Call underwent an incision and drainage of a large abscess on the dorsum of the right hand. (R. at 767-68, 825-28.) On September 29, 2014, Call was admitted for placement of a peripherally inserted central catheter, ("PICC"), line to his left upper extremity to treat cellulitis of Call's right hand. (R. at 769-70.) On October 3, 2014, Call presented to the emergency room at Johnston Memorial Hospital for increased right hand pain, redness and swelling. (R. at 736-37.) An incision and drainage of the abscess sight provided improvement of pain and swelling. (R. at 737.) An echocardiogram, dated September 28, 2014, showed a mildly dilated right atrium, a mild mitral annular calcification, mildly enlarged right ventricle, and no significant valvular flow abnormalities were noted. (R. at 738-39.) He was diagnosed with right hand cellulitis/abscess; uncontrolled diabetes mellitus; sepsis secondary to abscess; and intravenous drug abuser. (R. at 736.) On October 5, 2014, Call

presented to the emergency room at Johnston Memorial Hospital stating that his PICC line came out. (R. at 732-34.) Antibiotics were administered by IV for the infection of Call's right hand. (R. at 733-34.) On October 6, 2014,[9] Call underwent another PICC line placement in the left upper extremity. (R. at 730-31.)

On December 2, 2014, Christopher M. Carusi, Ph.D., a licensed clinical psychologist, evaluated Call at the request of Disability Determination Services. (R. at 724-26.) Call was dressed appropriately; his grooming was adequate; he walked without gait disturbance; he displayed no evidence of psychomotor retardation or agitation; his speech was muffled, organized and goal-directed; he was cooperative and responsive; his affect was broad, and his mood was neutral; he had no impairment of long-term and immediate memory; his short-term memory was impaired; he had adequate concentration; and his judgment was concrete. (R. at 724-25.) Call denied being hospitalized for psychiatric treatment, but reported that he was admitted to Southwestern Virginia Mental Health Institute due to substance abuse. (R. at 724.) Carusi diagnosed social phobia and assessed Call's then-current GAF score at 50. (R. at 726.)

Carusi completed a mental assessment, indicating that Call had no limitations on his ability to understand, remember and carry out instructions. (R. at 727-29.) He found that Call had mild limitations in his ability to interact with supervisors and co-workers and moderate limitations in his ability to interact with the public and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 728.) Carusi noted that these limitations resulted from Call's intense anxiety around people. (R. at 728.)

---

[9] On October 6, 2014, Rosenbaum noted that she received a mental capacity form from Call's attorney; however, she refused to complete the form because she had not seen Call since March 2014. (R. at 834.)

On December 22, 2014, Dr. Stephanie H. Alford, M.D., reported that Call's right hand was well-healed and neurovascularly intact. (R. at 819-20.) Call had some stiffness in his right hand, but he could completely flex and extend. (R. at 819.)

In June 2015, Dr. Kristin O. Bresowar, M.D., a physician with the Saltville Medical Center, reported that Call had good affect; good eye contact; normal speech; and did not appear to be depressed, anxious or stressed. (R. at 929.) In July 2015, there was no evidence of diabetic macular edema or retinopathy in either of Call's eyes. (R. at 919.) In addition, a diabetic foot exam in July 2015 revealed no evidence of prediabetic ulceration and intact sensation. (R. at 913.) Rosenbaum next saw Call on July 21, 2015, for his complaints of crying spells. (R. at 916-18.) Rosenbaum reported that Call had good hygiene and grooming; fair insight; no memory problems; congruent thought content; normal speech; coherent thought processes; and depressed mood and anxious affect. (R. at 917.) Rosenbaum diagnosed mild, recurrent major depression and generalized anxiety disorder. (R. at 917.)

In September 2015, after being told that a prescription for Tylenol #3 would be approved, Call stated that, "then it seems like you could give me a little Vicodin." (R. at 909.) Sadler-Chapman told Call that such a statement gave the appearance of narcotic seeking. (R. at 909.) On October 12, 2015, a depression screening indicated that Call had mild depression, and an anxiety screening showed mild anxiety. (R. at 902.) Rosenbaum reported that Call had good hygiene and grooming; fair insight; no memory problems; congruent thought content; normal speech; coherent thought processes; and depressed mood and anxious affect. (R. at 904.) Rosenbaum diagnosed mild, recurrent major depression and generalized anxiety disorder. (R. at 904.) On November 25, 2015, a depression

screening indicated that Call had mild depression, and an anxiety screening showed mild anxiety. (R. at 894.) Call reported that his mood had been "pretty good." (R. at 894.) He also reported that he had not experienced any panic attacks "in a long time." (R. at 894.) Rosenbaum reported that Call had good hygiene and grooming; fair insight; no memory problems; congruent thought content; normal speech; coherent thought processes; and congruent mood with mild anxiousness. (R. at 896.) Rosenbaum diagnosed mild, recurrent major depression and generalized anxiety disorder. (R. at 896.) In December 2015, Call was diagnosed with cellulitis of the left arm. (R. at 892.)

On February 10, 2016, Call reported that he had not experienced any panic attacks. (R. at 887.) A depression screening indicated that Call had mild depression, and an anxiety screening showed moderate anxiety. (R. at 887.) Rosenbaum reported that Call had good hygiene and grooming; fair insight; no memory problems; congruent thought content; normal speech; coherent thought processes; and congruent mood with mild anxiousness. (R. at 889.) Rosenbaum diagnosed generalized anxiety disorder and mild, major depressive disorder, recurrent episode. (R. at 889.) On February 4, 2016, Call complained of pain in his knees, shoulders and right wrist. (R. at 890.) Teresa L. Fullen, F.N.P., a family nurse practitioner with the Saltville Medical Center, reported that Call had no clubbing, cyanosis, erythema or edema in his extremities. (R. at 890.) On February 11, 2016, Call had a normal gait and good range of motion in both the upper and lower extremities. (R. at 885.) Again, in May 2016, it was noted that Call had good range of motion in his upper and lower extremities. (R. at 876.) In June 2016, Call was concerned that his pain medication would be discontinued. (R. at 873.) In July 2016, Sadler-Chapman noted that Call reported that his arm was fine four days prior, but was then reporting that "it's killing" him. (R. at 868.) Call requested narcotics. (R. at 868.) Sadler-Chapman diagnosed cellulitis and treated Call with

antibiotics and a prescription-strength NSAID. (R. at 868.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2017). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2017).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Call argues that the ALJ failed to properly evaluate the opinions of Dr. Grady, Carusi and Rosenbaum in determining his residual functional capacity. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's

Brief"), at 11-15.) Based on my review of the record, I find this argument unpersuasive. While the ALJ, in general, is required to give more weight to opinion evidence from examining sources versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a consultative examiner. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (2017). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

Call argues that the ALJ erred by failing to adopt Dr. Grady's assessment that he could only occasionally reach, handle, feel, grasp and finger. (Plaintiff's Brief at 11-12.) The ALJ noted that he gave Dr. Grady's assessment limited weight because the limitations placed on Call's upper extremities were not supported by objective evidence and were inconsistent with the treatment record. (R. at 19.) In fact, Dr. Grady's clinical findings do not support her assessment. Dr. Grady found that Call had normal range of motion in his shoulders, hands and fingers; he had full strength in his upper extremities and full grip strength; he had no tenderness to palpitation or crepitus in his shoulders; and he had intact sensation and reflexes throughout his upper extremities. (R. at 622-23, 625.) The ALJ noted that Call rarely sought treatment for upper extremity complaints, and when he did, treatment of his upper extremities was primarily for acute infections, which resolved with treatment. (R. at 19.) With regard to Call's right rotator cuff tear, he complained of right shoulder pain to treating sources on only two occasions. (R. at 644, 878.) In 2016, it was noted that Call had good range of motion of both the upper and lower extremities. (R. at 876, 885.) Call was not referred for any additional treatment for his shoulder. Call sought treatment on several occasions for pain in his upper extremities, but these complaints of pain were associated with abscesses and cellulitis of his upper extremities. (R. at 698, 702, 742-53, 898.) Despite initially

alleging acute traumatic injuries as the cause of his abscesses and cellulitis, Call later admitted to intravenous drug use and tested positive for the use of methamphetamine. (R. at 742, 943.) Call was treated with incisional drainage and antibiotics, and his infections resolved without any significant residual limitations. (R. at 698, 702, 752, 767-68, 819, 898.)

Further, Dr. Grady's upper extremity limitations also were inconsistent with the opinion of medical expert Dr. Rennie. (R. at 19-20, 683.) Dr. Rennie opined that Call could occasionally reach overhead with his right upper extremity and could at least frequently reach in all other directions and continuously handle, finger, and feel with his bilateral upper extremities. (R. at 683.) The ALJ found Dr. Rennie's upper extremity limitations were entitled to more weight, given her expertise and the consistency of her opinion with the record evidence. (R. at 19-20.) The ALJ also considered Call's activities that required significant use of his upper extremities, such as fishing. (R. at 23.)

Based on this, I find that the ALJ appropriately afforded little weight to Dr. Grady's upper extremity limitations because they were overly restrictive given her objective examination findings and the record as a whole. Nevertheless, the ALJ did not find that Call was without upper extremity limitations and incorporated limitations into the residual functional capacity that were supported by the record. Specifically, the ALJ limited Call to occasional overhead reaching with his right upper extremity and frequent reaching in all other directions, handling and fingering with his bilateral upper extremities. (R. at 15.)

Next, Call argues that the ALJ erred by failing to properly weigh the medical opinion of Carusi. (Plaintiff's Brief at 13.) Specifically, Call argues that the ALJ erred by failing to discuss Carusi's assessed GAF score of 50 and affording more

weight to his medical source statement. (Plaintiff's Brief at 13.) It has been the Commissioner's longstanding position that the GAF scale does not have a direct correlation to the severity requirements in the Commissioner's mental disorders listings, and it is never dispositive in the disability determination. *See* Revised Medical Criteria for Evaluating Mental Disorders & Traumatic Brain Injury, 65 Fed. Reg. 50746-01, 50764-65 (Aug. 21, 2000). Courts have found that GAF scores are not necessarily indicative of an individual's ability to work. *See Gilroy v. Astrue*, 351 F. App'x 714, 715 (3d Cir. 2009) ("a GAF score of 45, if credited, would not require a finding of disability"); *Powell v. Astrue*, 927 F. Supp. 2d 267, 273 (W.D. N.C. 2013) ("A GAF score is thus not dispositive of anything in and of itself" and has no direct legal or medical correlation to the severity requirements of social security regulations) (citing *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011)).

The latest edition of the DSM-V no longer includes the GAF scale, in part, because of its lack of conceptual clarity and questionable psychometrics in routine practice. *See Finley v. Colvin*, 2013 WL 6384355, at *23 n.9 (S.D. W. Va. Dec. 5, 2013); *Brown v. Colvin*, 2013 WL 6039018, at *7 n.3 (E.D. Wash. Nov. 14, 2013). Following the DSM-V's deletion of the GAF scale, the Agency released an Administrative Message, AM-13066, on July 22, 2013, stating:

> [A] GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. *Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.* Admin. Message 13066, Global Assessment of Functioning (GAF)

Evidence in Disability Adjudication (Soc. Sec. Admin. July 22, 2013).

*Lee v. Colvin*, 2014 WL 2586935, at *6 n.3 (E.D. Pa. June 10, 2014) (emphasis added). Thus, where a physician "has not 'clearly explain[ed]' the reasons for his GAF score, the SSA has found that the GAF score does not provide a 'reliable longitudinal picture' of a claimant's mental functioning." *Lee*, 2014 WL 2586935, at *6 n.3. The Agency reaffirmed that a "GAF score is never dispositive of impairment severity" and an ALJ should not "give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence." *Ladd v. Astrue*, 2014 WL 2011638, at *1 n.2 (E.D. Pa. May 16, 2014) (citing AM-13066). Accordingly, since the issuance of the DSM-V and the Agency's clarifying policy, courts have become more reluctant to find error in failure to discuss a GAF score, and have expressly rejected arguments that a GAF score of 50 or lower constitutes an inability to work for purposes of a Social Security determination. *See Clayton v. Colvin*, 2014 WL 5439796, at *6 (W.D. Pa. Oct. 24, 2014) ("absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score alone is insufficient to establish disability."); *Schneider v. Colvin*, 2014 WL 4269083, at *4 n.5 (D. Conn. Aug. 29, 2014) ("Since the issuance of the DSM-V, courts have become even more reluctant to find any error in the failure to consider a plaintiff's GAF scores"); *Murray v. Comm'r of Soc. Sec.*, 2013 WL 5428734, at *3 n.2 (N.D. Ohio Sept. 26, 2013). This deletion suggests that GAF scores, while medical evidence, are not so probative as to warrant automatic reversal if not discussed. *See Stoyer v. Colvin*, 2014 WL 4272764, at *18 (M.D. Pa. Aug. 28, 2014) ("[I]t was harmless error for the ALJ to neglect to mention the GAF scores from [plaintiff's] hospitalization in September of 2010, especially in light of the recent changes to the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders regarding GAF scores[.]"); *Alcott v. Colvin*, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014)

("Accordingly, the DSM-V's rejection of the GAF assessment aside, substantial evidence in the record supports a rejection of the GAF scores and a failure to discuss them is harmless error.").

Under this clarified framework, the ALJ's failure to explicitly weigh Carusi's assessed GAF score of 50 does not warrant remand in the present case where the ALJ thoroughly analyzed the mental health evidence of record, discussed Carusi's narrative report, wherein the GAF score was provided, and explicitly weighed Carusi's opinion that assessed specific work-related limitations. *See Paris v. Colvin*, 2014 WL 534057, at *6 (W.D. Va. Feb. 10, 2014) ("[T]he failure to reference a [GAF] score is not, standing alone, sufficient ground to reverse a disability determination. This is particularly true ... where the ALJ fully evaluated the records and treatment notes upon which the GAF scores were based.") (internal citations omitted); *Clemins v. Astrue*, 2014 WL 4093424, at *19-20 (W.D. Va. Aug. 18, 2014) (finding that failure to discuss GAF scores did not warrant remand where the ALJ considered Plaintiff's mental health treatment records).

The ALJ thoroughly discussed Call's longitudinal mental health treatment, including Carusi's narrative report wherein the GAF score was provided. (R. at 16-22.) As the ALJ discussed, Call received routine mental health therapy, from which he benefited, and he made significant improvement with medication and therapy such that he related "good symptom control." (R. at 554, 556, 562, 572, 576, 636, 640, 656, 660, 662, 694, 816, 849, 852.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Moreover, the ALJ noted that Carusi's examination was relatively normal. (R. at 20, 725.) For instance, Carusi found that Call was responsive and cooperative; his mood was neutral and affect was broad;

his concentration was adequate, demonstrated by his ability to perform serial threes without error and serial sevens with only one error; he solved simple mental calculations; he repeated a simple phrase; and spelled "table forward and backward." (R. at 725.)

Lastly, Call argues that the ALJ improperly weighed the opinion of Rosenbaum. (Plaintiff's Brief at 13-15.) The ALJ stated that he was giving Rosenbaum's opinion "little weight" because it was not supported by the medical evidence of record, including Rosenbaum's own treatment notes. (R. at 21.) For example, the ALJ explained that Rosenbaum's treatment notes show that Call complained of generalized anxiety, which could make it difficult for him to work closely with other people, particularly in crowds of other people or with the public. (R. at 21.) The ALJ also noted that, even though Call may not be able to work around crowds or with the public, he consistently had normal interaction with his other treating providers, suggesting that he could work around co-workers. (R. at 21.) In addition, the ALJ noted that Rosenbaum's opinion consisted of only checked boxes with no explanation or support given for her extreme and disabling opinion. (R. at 21.)

Courts within this Circuit have found that such conclusory check box reports are not strong evidence of disability. *See*, *e.g*, *Shelton v. Colvin*, 2015 WL 1276903, at *3 (W.D. Va. Mar. 20, 2015) ("The magistrate judge is correct in stating these checkbox forms are of limited probative value."); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (same); *Bishop v. Astrue*, 2012 WL 951775, at *3 n.5 (D. S.C. Mar. 20, 2012) ("The court notes that '[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.'"); *Siddons v. Colvin*, 2014 WL 6893802, at *11 (E.D. N.C. Dec. 5, 2014) ("[f]orm reports such as questionnaires are arguably entitled to

little weight due to the lack of explanation"); *Norman v. Comm'r of Social Sec.*, 2014 WL 5365290, at *27 (N.D. W.Va. Oct. 21, 2014) ("the undersigned notes that the majority of this questionnaire was in a 'check off' form, which has been referred to by other courts as 'weak evidence at best.'"); *McGlothlen v. Astrue*, 2012 WL 3647411, at *6 (E.D. N.C. Aug. 23, 2012) (finding a form questionnaire "entitled to little weight" due to the lack of substantive explanation.); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

Furthermore, Rosenbaum's treatment notes repeatedly showed that Call had fair grooming; appropriate behavior; fair insight; no memory problems; normal thought content; normal speech; coherent thought processes; anxious mood and depressed affect. (R. at 554, 556, 558, 562, 568, 570, 574, 578, 583, 586, 632, 636, 640, 646, 650, 652, 656, 660, 662, 889, 896, 904.) Call reported on numerous occasions that his medication, breathing techniques and counseling helped his symptoms of depression and panic attacks. (R. at 558, 562, 572, 574, 576, 585, 636, 640, 662, 688, 694, 712, 717, 816, 849, 852, 855.) In May 2014, Call denied anxiety and depression. (R. at 700.) In June 2015, Dr. Bresowar noted that Call did not appear to be depressed, anxious or stressed. (R. at 929.) Based on this, I find that the ALJ properly weighed the medical evidence.

Based on the above, I find that substantial evidence exists in the record to support the ALJ's finding that Call was not disabled. An appropriate Order and Judgment will be entered.

DATED:     July 25, 2018.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE